Mr. Geisnes. Thank you. May it please the Court, Tom Geisnes on behalf of Ms. Sherry in this particular case, a maritime case under the Jones Act. And the plaintiff brought this case to this Court based upon what it believes several errors of law were committed, and the first thing that concerned us was the fact that the Court did not find or address the issues really of negligence or unsaverness. In this case, the testimony is undisputed that the plaintiff worked under conditions for a long period of time, where for every meal that was prepared in the galley, the intrepid was that water and soap would be spewing out of the pipe onto the deck. And this was a matter that had to be cleaned up continually while the meals were in process. And on this particular day in November of 2004, she slipped on this condition. The testimony of the two other people that worked in the galley in that day supported these contentions, and there's no evidence to refute the conditions that they existed on this particular vessel. Assuming the conditions existed, certainly assuming she fell, the issue, at least as I understood it, in the district court, was whether or not that caused the injury that she claims. And the district court found, as a matter of fact, that it didn't. Well, I guess I just have to analyze the case a little bit differently, because I think in my approach to this for a long time, you would always kind of address the first issues of whether or not an unsafe condition existed. And I agree. The next question is, was the unsafe condition the cause of the injuries or damages she claimed? It was unsafe. Yes. It didn't cause it, so it didn't cause it. Well, she slipped and fell, and probably the first person who testified about whether or not she had injuries in that particular instance was the chief cook, because in his case, he had back complaints at that time. She also testified, of course, about back complaints and problems. And then there's a long history of going to seeing physicians after several months she went to a physician because she continued to have worse problems. And that was at Diego Garcia, and that doctor clearly found that she had low back limitations, she had numbness, and she had limitations of he didn't connect them with that incident. She had degenerative issues. Well, I think that the doctor, well, let me just say, the doctor at Diego Garcia didn't talk about arthritic conditions. He did talk about some changes in her spine that would be similar to time going by. But his comments were that she's had this problem since the history that she gave the doctor, and then he was the one that found her not fit for duty, and they sent her back to Seattle or Tacoma. Then the defendant had her seen, she went to her own primary care position at that time, and the defendant had her seen by a very expert orthopedic, Dr. Chaplin. Dr. Chaplin made the same findings that, and this was in March of 2005, that she had low back complaints, that she had sciatic nerve problems, and he diagnosed a contusion or bruising to the sciatic nerve and said that he thought she would be able to go back to work in four to six weeks from the time that he saw her. And all these documents are in evidence. These documents were not excluded from evidence. Maybe the missing element is to show that her condition was worse because of the fall. There's no doubt that she had some back problems there, but there has to be some evidence that the condition was worsened, isn't that correct? Some. I think, as the case had pointed out, the prior fact can take notice or make a finding as to some common things that we experience in our lifetime. For example, if somebody falls, it's not beyond the scope, and says their back hurts, it's not beyond the scope of common knowledge that when you land on your buttocks and take a serious fall that you can have back complaints and back problems. I think that would be what our position is because all these documents are in evidence that the court can review all these documents and make that determination as to how she was doing at a certain time. There was, and I think that there's ample evidence of her continuing to have back problems. Now, as this Court knows, another part of our motion in this case is that the plaintiff's treating physician was excluded from testifying at the time of trial on the issue of causation. But I think that when you think about that, we didn't need the testimony of the treating physician to establish that she did have back problems for a given period of time and received treatment for that period of time because the records were all available for the court to review and make that determination. And there was no evidence from those initial doctors, Dr. and D.O. Garcia, and the doctor chaplain in Tacoma, as well as her own treating physicians. All those records are all consistent about her complaints, their findings about her limitations, and they're relating those to the accident of November of 2004. You said at the outset that you'd brought a claim under the Jones Act and for unseaworthiness. I didn't see in your brief that you argued unseaworthiness. It's a different causation standard. You have to have a substantial factor. You argue the – well, I thought your principal argument was – in fact, standard of causation and proceeded to require more of a connective link between the event, the supposed fall, and her condition. What are you arguing? Well, we argue both negligence, Your Honor, and unseaworthiness. Well, where do you argue – well, where is any evidence that it was a substantial cause? I'm sorry, I didn't understand the last word. Where is there any evidence – I mean, they're different causes of action. They're different standards, don't you think? Well, we felt that – Well, if you can't satisfy the Jones Act negligence, then you probably couldn't meet the unseaworthiness. Isn't that correct? Well, seaworthiness directs itself to an unsafe condition. I understand that. Jones Act generally speaks in negligence. We thought that when you have this condition that the evidence establishes has been going on on this vessel for probably approximately a year's time, that that's such a bad negligence. Right, but you still – don't you, under unseaworthiness, have to still establish that the unseaworthy condition was a substantial factor in the injury? And we think that the evidence also shows that because she slipped on a deck and all the witnesses – one witness said it was wet, one witness said it was wet and soapy, and she testified it was wet and soapy. So I think that – and to me that's like a textbook case of unseaworthy condition. And I think that negligence – it could be negligence to allow the condition to continue to occur. And that's how I kind of differentiate the two under those circumstances. But I think it could be either or, and she's entitled to make a recovery in a case like this. So then I guess the other point I should say would be that we think that – well, the three points were that both as to finding – failing to find negligence or addressing that issue and failing, again, with unseaworthiness, the evidence clearly supports those issues. And then the third issue, the Court says that the Court found that the issues of causation under the facts of this case calls for expert medical testimony. And I think that's wrong because I think there's ample evidence that was not objected to, that was submitted by both parties that was in the exhibits, which would amply support a claim of her problems at least up through the period of May of 2005. Then they also had their expert, Dr. Green, who testified. And he examined her two years later, and he still found similar symptoms, though to a lesser degree, in his initial report. And that is that she had a sciatic problem and low back injury from the fall. And his record in the exhibit says the same thing. It occurred from the November 2004 fall that Ms. Cherry underwent. Is there anything in any of the exhibits or testimony that she had been fully able to work before, never had any time off or little time off, and then she had back troubles subsequent to the fall? Correct. It's all there, is it? I think it's all there on the records themselves. And then, as I mentioned, it even goes up through Dr. Green, whose last visit was in 2007. Dr. Moravec's records go from the – My understanding is Dr. Green testified that there was no objective evidence of a cause,  I think, Your Honor, you're able to – I think he tried to testify to that in his deposition. He testified. But I was – what I'm referring to is the report that he wrote when he first saw her in June of 2007. I think his deposition is a little bit different than his testimony in his medical report that he wrote in 2007. And that's, of course, up to the prior fact to make a determination. Which the prior fact did. I mean, that's the – Well, but there was other evidence way preceding Dr. Green's evaluation. As I say, he wasn't – he didn't see her until 2007. Well, let me address briefly the issue of – I only have a few minutes, I see – of the abuse of discretion in not allowing Dr. Moravec to testify in this particular case. As the record indicates, we disclosed in the initial disclosure that we would call or will call the treating physicians of the plaintiff in this particular case. At that point in time, she was still in her treatment. We didn't know all the treating physicians she might have. As time went on, it never changed from Dr. Moravec. And so we did provide for the defendants all the information from Dr. Moravec. Then we also continued to provide all the diagnostic testing that he did as time went on. As we mentioned in our brief, the defendants had a chance to ask our client about treatment from Dr. Moravec. And so they claimed at the time of trial that they didn't realize that he was being called as an expert witness. And I think by listing – at least, I guess, what had always happened before, we had listed treating physicians, and I assume by listing a treating physician – and we didn't give his name, but his name was on all the records provided, and it should be remembered that this treating physician was also a doctor the defendants relied upon to – when this Cherry was found fit for duty again. So we think that they had ample knowledge that we were going to call him as a witness, and I can't ever recall how – what happened, Your Honor – what happened is this. When the court ruled on the first day of trial that he wasn't going to be allowed to testify to causation, I didn't want to have to pay this doctor to come in and testify to things that would have no – I couldn't do that to my client, because their trial testimony today is very expensive. And so I couldn't bring him in under those circumstances. But we thought we had ample evidence for a substantial part of our trial. With Dr. Moravec, but – and I just say that – and here's the process that happened. We had moved before trial for continuance of this matter, because he was undergoing new medical treatment for the patient at this point in time and said that her treatment should be concluded by January of 2008, more or less. For that procedure, we made an affidavit, of course, setting out what his testimony was going to be and why he wanted to have this treatment. And, of course, the government had the chance or the defendant had the chance in this particular case to use that affidavit when they cross-examined Dr. Green. But we were still not allowed to bring our doctor in for causation testimony. And it was – so that – and so that was what happened. That was the sequence of events that happened. Thank you. Okay. You probably want to save your – Pardon? Probably want to save a little time. I have 19 seconds. Sorry. Good morning, Your Honors. Eric Hoffman Cohen on behalf of the United States of America. If it pleases the Court, I'd like to start by saying that the issues discussed by Plaintiff regarding causation and the exclusion of Dr. Moravac are – Pull the mic down just a little. The issues of causation and the issue of whether it was proper for the Court to exclude Dr. Moravac's testimony as to causation are the proverbial red herring. And this is because it is clear from the record below that, indeed, Dr. Moravac did testify. He testified through his medical records, which were submitted to the Court by the Plaintiff. And he also testified through Dr. Green, the government's own expert medical treater. Well, that's not quite the same. It's not the same. But if you look at Dr. Green's deposition testimony, Dr. Green was questioned regarding the declaration submitted by Plaintiff. Could I get you to back up a minute? Because we're sort of jumping into the proof. And the thing that gets my attention in the district court's opinion is his rejection of what he calls a mythical featherweight burden on causation, which term has been loosely and improperly employed. And then he cites two out-of-circuit cases, or an out-of-circuit case in Schoenbaum. The law in this circuit is quite clearly that the featherweight standard does apply in a Jones Act negligent case, as I understand it, and it doesn't take very much to show causation. So what do we do with the district court's analysis under a Jones Act negligence claim where he has rejected the governing legal standard and comes to a conclusion? Why should we credit anything that the judge finds on a negligence claim when he's operating overtly under a higher standard of proof? Under the Jones Act, it's not featherweight standardized to negligence. The featherweight goes to causation. But that's what he is addressing here. That's what he's talking about in the context of causation. Correct. And he's also saying that even in a Jones Act case, you have to show causation. It's got to be degree of proof. A degree of proof is a lesser degree of proof, correct, Your Honor, of featherweight, whether it contributed at all. Right. But in this position, Your Honor, there is no evidence that the alleged fall contributed at all to the symptoms Ms. Cherry was suffering three years past the time of the fall. Well, how do we know that? That's not how the ñ that's a fact finding that the district court made under a higher burden of proof standard. So you are asking us to take what's in the record, then, where the district court has not looked at the evidence under the proper proximate cause standard, and for us to conclude, applying our judgment, that on this record that they couldn't have ñ that she couldn't have met the lesser standard? So, Nick, clearly the district court's finding of causation is reviewed under this court in an anomaly setting as clearly erroneous. The clearly erroneous standard gives due deference to the court's findings of credibility. Yeah, but this has nothing to do with credibility. He's viewing it under ñ he says, I'm looking at it to establish, I suspect, it appears he was applying what he would have to find under the unseaworthiness standard of proximate cause, which is at least, I understand, requires it to be a ñ the unseaworthy condition has to be a substantial factor in the cause of the injury. But under the Jones Act proximate cause standard, it seems to be that it doesn't take much proof at all. And if the judge is applying the more rigorous standard, then I'm at a loss to know how to get in the judge's head and decide how he was viewing all the evidence. You can get into the judge's head by the fact that this district court found that there was no causation in this case. The district court found this cherry did not meet her burden, whether that burden would be featherweight or whether it didn't. No, he didn't find that because he rejected the featherweight. So it doesn't exist. It's a mythical standard. I think the case law that he cites to ñ Look, the featherweight test is, according to our case law, says, the test often described as the featherweight causation standard allows a seaman to survive summary judgment by presenting even the slightest proof of causation. Even the slightest. And he rejects that. So how am I supposed to sit here and say, well, he's now evaluated causation under the wrong standard, and I should defer to it as not being clearly erroneous? First, we weren't on a summary judgment standard. We were on a full-blown trial where evidence was presented, conflicting evidence was presented. The declarations of Dr. Moravac, which Dr. Green was testified to, he concluded by reasonable preponderance that the fall caused the accident. When asked about that, Dr. Green says, no, it was his conclusion that it did not. There's conflicting evidence there. The court's faced with two conflicting medical testimonies. Based upon the entire record and based upon issues of credibility, which I think are paramount in this case, the judge decided to go with the conclusion that Ms. Cherry did not carry her burden whatsoever as to causation. And there is plenty in the record to support that. And this court has to pay due respect to the trial court's findings on issues of credibility. And the court ‑‑ I submit to the court that the court stated on the record that it had problems with credibility. I say this is the court at the transcripts, volume 1, page 20, lines 23 to 25. Quote, in light of all the court has to say, what I am seeing running through this whole case now is a whole lot of credibility issues in terms of this case. And that's what this case boils down to, Your Honors, is the credibility fact. We have an issue here. It's an unwitnessed alleged slip and fall. Contrary to what Ms. Cherry says, Chief Cook Breyer and the general vessel assistant, Sella, didn't see the accident. They testified. Sella said, I had my back to it. I heard something. I turned around. Breyer said he was in the galley when it happened, and he came out and saw her on the floor. In Breyer's deposition, two years later, he says, after that, she told me her back hurts. But I point to you that general vessel assistant, Sella, in his statement, which we have in the supplemental excerpts of record, and that's number five. He says, quote, the day that the steward fell, I was in the pantry washing dishes. The steward passed me, going to officer's mess. I was working with my back toward. I heard the steward fall because she was on the floor. When I turned around, she was making sounds. The chief cook, out of the galley, we then picked her up. The chief cook then asked her if she was all right. She said she was all right and walked away. This is February of 2005, three months after the accident, not two years later at a deposition. I've asked people who tell me they've been rear-ended. Did you separate any injuries? They said, no, I'm all right. About two weeks later, their neck starts to bother them. Correct. So they precluded from filing a claim for damages based on the fact that their immediate reaction, when all the circumstances suggest she just did slip and fall. No, Your Honor. Because she said she's all right. That's conclusive. No, but it goes to credibility issues. It goes to two different people saying two different things. Also, Your Honor, anyone can make a claim. Yeah, if you're rear-ended, you're going to make a claim. But here, we have to look at the facts. It wasn't until three months later that Ms. Cherry asked to go ashore and be seen by a doctor. During that three-month period, there's testimony in the record showing that she never complained about her back. She continued to perform her duties to the full extent. She was seen running up ladders with packages under her arms. She was seen climbing Jacob's ladders with backpacks on. She was seen jumping from a gangway onto a pitching rolling launch. Also, we get to the videotape, which I'm not sure if you've seen. She comes back after three days of being in transit on airplanes with a hurt back. She's wearing a backpack. She's able to lift luggage off the carousel by herself with no problem. On a Mercedes. And she's able to lift up her heavy suitcase into a nice shiny new Mercedes, yes, Your Honor, while wearing spiked high-heeled shoes, to that matter. So it does fall back to the issue of credibility. Evidence was submitted on the record. Conflicting evidence. Evidence is what she said to who when. Two conflicting medical testimonies. One saying the fall caused the accident. The fall caused her alleged injuries. Another doctor saying, no, he's find no facts to substantiate that. And if you look at all the medical records, they can't pinpoint what's causing her subjective complaints of pain. This is the Stork versus Yeager case. Basically on all fours. That court case says you slip and fall. You tell somebody you hurt your back. You don't need an expert to tell you that. But if symptoms prevail for over a year, in that case it was over a year, but in our case it was over three years, and you have multiple doctors administering multiple tests, then you need experts even to find that featherweight causation. The court needed to have something, somebody to come in and tell it. Well, how is it three years later, nobody can figure out why she's feeling that pain. And here we had, she had six doctors examine her. She went through three treating physicians. She had two MRIs and two electro, I'm not even sure what they're called, but the electrical tests to the muscles. And still, the doctor, her treating physician, Dr. Moravac, was recommending more tests and more shots and more investigation. But it's all based upon her subjective complaints of pain on her. And that's where I think, even if you find that he was clearly erroneous in deciding what standard to use on the causation, his decision was based upon a finding of credibility, which should not be disturbed on appeal, because he's the trier of fact. The trier of fact, and this talk about how Dr. Moravac wouldn't show up because he couldn't talk about causation, that's not true, Your Honor. He didn't show up because he was too busy to show up, and he didn't show up because he wasn't subpoenaed to show up. I don't know why the doctor, the treating doctor, refused to come in and testify on behalf of his own patient. Also, we have the occurrence where the chief vessel steward, the vessel assistant, sees Miss Cherry coming down hours later, starting and stopping the dishwasher and taking pictures. And when he asks what she's doing, he tells her, she tells him to shush and not to tell anybody. This is the smell test, Your Honor, and the district court is in the best position to make that determination. And the record clearly finds enough of the credibility issue, which should not be disturbed on appeal. And in just closing, Your Honor, I don't have much more to say, and I'd be happy to take more questions, but this court put it succinctly in Mattson Navigation, that Lieberman v. Mattson Navigation, that's 300 half-seconds, 661, and I quote this court, although it's not clear from the record whether the trial court believed the plaintiff and yet found no negligence or unseaworthiness or disbelieved the plaintiff, at the trier of factual issues, he was entitled to do either. Okay. Thank you, counsel. Mr. Essence, do you have a hand? I guess my 19 seconds I would say that what I think was clearly when we went to trial and once we lost our expert witness, Dr. Moravec, we realized we didn't have a complete case, but we proceeded, and I think that she's entitled to have the case decided based upon the evidence that was presented to the court, and there was ample evidence to present that would allow her to, first of all, be entitled to recover damages and to recover damages within the scope that was available. Thank you. All right. Thank you, counsel, both of you. The matter just argued will be submitted, and we'll make the argument in the College of Life, which is fine.
judges: Fletcher, Rymer, Fisher